**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | : | MAG NO. _____ |
| OF THE UNITED STATES OF AMERICA | : | |
| FOR A SEARCH WARRANT FOR A | : | |
| A ZTE MODEL Z993 | : | |
| CELLULAR TELEPHONE, | : | |
| SERIAL NUMBER 327B41011216, | : | |
| CURRENTLY LOCATED AT | : | |
| XXXX X STREET, N.W., | : | |
| XXXXXXXXXX, X.X. XXXXX | : | |

<u>**AFFIDAVIT**</u>

Your affiant, Samuel R. Katz, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), assigned to the Washington, D.C., High Intensity Drug Trafficking Area Task Force (HIDTA), having been duly sworn, depose and state as follows:

**I.      TRAINING AND EXPERIENCE**

1.      I have been a Special Agent with the ATF since January 2010.  I am currently assigned to the Washington, D.C. metropolitan area HIDTA Task Force and have attended numerous schools and training venues hosted by the ATF, HIDTA, and the Department of Justice, dealing in various techniques of investigating firearm and narcotics related crime.  Since becoming a Special Agent with the ATF, I have taken part in numerous federal, state and local investigations concerning violations of firearm and narcotic laws.

2.      During my tenure with the ATF, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.  In the course of conducting these investigations, I have been involved in the preparation, presentation and execution of numerous search and arrest warrants which have resulted in the recovery of firearms, narcotics, currency and documentary evidence indicative of firearm and narcotic trafficking organizations.  Many of these investigations have

resulted in arrests leading to convictions for violations of federal firearm laws and violations of the Controlled Substances Act. During these investigations, I have been involved in the use of the following investigative techniques: interviewing confidential sources and cooperating witnesses; conducting physical surveillance, conducting short and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register data; requesting, collecting and analyzing billing records; and conducting court-authorized electronic surveillance.

3.      Through instruction and participation in firearms and narcotics related investigations, I have become familiar with the manner and methods in which narcotics traffickers conduct their illegal business. I know that it is common for individuals who sell narcotics to amass large amounts of cash proceeds from illegal drug sales. I am aware that unexplained wealth is probative evidence of illegal activities, such as drug trafficking. I have learned that drug traffickers often place assets in corporate entities or in names other than their own in an effort to avoid detection of these assets by government agencies. I have also learned that drug traffickers are often engaged in a legitimate business, which may produce legitimate income for them; however, their business commonly becomes nothing more than a business "front" i.e., a point of drug distribution. In addition, the business provides a means of laundering drug income, whereby the drug trafficker can commingle their drug proceeds with legitimate income earned by the business. Further, based upon my knowledge, training, experience and participation in firearms and narcotics trafficking investigations, I know that:

a.      Individuals who deal in the sale and distribution of illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders and

2

other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances.  These items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

b.      Individuals involved in the sale and distribution of illegal controlled substances often own, possess and/or use firearms as a means of facilitating their illegal drug activities.  These firearms are often used to protect and secure a drug trafficker's narcotics supply and/or cash proceeds acquired from the sale and distribution of illegal controlled substances from theft by other criminals.  Drug traffickers also possess firearms as a means of enforcing drug transactions, i.e., as a means of ensuring payment for the drugs they are selling.  Persons who possess or collect firearms also keep other firearm related equipment, to include ammunition, ammunition magazines, holsters, bullet proof vests, pistol grips, pistol boxes, cleaning kits, pictures of firearms and paperwork relating to the acquisition and disposition of firearms.  The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

c.      Individuals who deal in the sale and distribution of illegal controlled substances routinely conceal large quantities of currency, financial instruments, precious metals, jewelry, and other items of value, typically proceeds of illegal controlled substance transactions.

Indeed, when drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits.  To accomplish this, drug traffickers may utilize domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks, money drafts, letters of credit and safe deposit boxes.  All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

        d.     Individuals who deal in the sale and distribution of illegal controlled substances often secrete contraband and tools related to those activities such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, pots, dishes and other containers for preparing crack cocaine and other controlled substances for distribution.  These items are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

        e.     Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses and/or telephone numbers for their associates.  These individuals often utilize cellular telephones to maintain contact with their associates in their illegal businesses.  These telephone records, bills and paper numbers are often found in locations to which dealers of illegal

controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

f.      Individuals who deal in the sale and distribution of illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband.  These items are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

g.      Individuals who deal in the sale and distribution of illegal controlled substances stay in regular contact with one another.  This contact does not terminate once an individual is incarcerated.  Incarcerated members of drug organizations routinely send letters to and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help in engaging in witness intimidation or elimination.  In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates.  These items are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

h.     Individuals who engage in the sale and distribution of illegal controlled substances often utilize electronic equipment, such as computers, personal data assistants (PDA's), digital cameras, scanners, and/or facsimile machines to generate (in the form of electronic data), store, transfer and/or print documents containing information regarding financial transactions involving assets that are typically acquired from proceeds of illegal controlled substance transactions.   These items are often found in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

4.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  See 18 U.S.C. § 1030(e)(1).

b.     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards,

printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

c.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

d.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

## II.   BACKGROUND

### A.   <u>BACKGROUND OF INVESTIGATION</u>

5.      As part of your affiant's current assignment, your affiant and others have been investigating narcotics and firearms trafficking by XXXXXXXXX XXXXXXX HOOKS in the District of Columbia and the District of Maryland.  The investigation has revealed that the subject individuals have committed the subject offenses.

6.      Your affiant respectfully submits this affidavit in support of an application for a warrant to search a ZTE Model Z993 cellular telephone, serial number 327B41011216, currently located at XXXX X Street, X.X., XXXXXXXXXX, X.X. XXXXX, which was seized by ATF on October 8, 2014, during the execution of a search warrant at the Oxon Hill, MD, residence of XXXXXXXXX XXXXXXX HOOKS (the "target telephone"), as further described in Attachment A, there exists evidence and instrumentalities of the subject offenses, as set forth more fully in Attachment B.

7.      I have participated in the investigation of the offense set forth below.  The facts and information contained in this affidavit are based upon my personal knowledge, information obtained during controlled purchases of illegal narcotics and firearms, information obtained from physical surveillance, information obtained from federal, state and local law enforcement officers and information obtained from interviews and analysis of reports.  In several instances I have received information from a confidential informant (CW-1).  This information is denoted as such in this affidavit.  To the extent possible, information provided by CW-1 relevant to this investigation has been corroborated through law enforcement or other secondary reliable sources.  All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.  Additionally, wherever in this affidavit I quote statements made by an individual; those quotations have been taken from draft transcripts/summaries of those statements, which are subject to further revision.

8.      I have not set forth each and every fact learned during the course of this investigation.  I have set forth only those facts which establish the foundation for probable cause.

Facts not set forth herein are not being relied upon to establish probable cause.  Nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of a search warrant for the target telephone.

B.    <u>**RELEVANT STATUTES**</u>

9.    This investigation concerns alleged violations of Title 21, United States Code, Section § 841(a)(1), which prohibits the knowing or intentional manufacturing, distribution, or dispensation, or possession with intent to manufacture, distribute, or dispense, a controlled substance, including a mixture or substance containing detectable amounts of heroin and cocaine. This investigation also concerns alleged violations of Title 21, United States Code, Section § 846, which prohibits attempts and conspiracies to violate federal narcotics laws, including but not limited to violations of Title 21, United States Code, Section § 841(a)(1).  This investigation also concerns alleged violations of 18 U.S.C. § 922(g), which prohibits the possession of firearms and ammunition by anyone who has been convicted of a crime punishable by imprisonment for a term exceeding one year.   This investigation further concerns alleged violations of 18 U.S.C. § 924(c)(1), which prohibits using, carrying and possessing a firearm during a drug trafficking offense, in violation.   Finally, the investigation concerns alleged violations of 18 U.S.C. §922(a)(1)(A), which prohibits the engaging in the business of dealing in firearms without a license.

III.    **PROBABLE CAUSE AS TO NARCOTICS AND FIREARMS TRAFFICKING.**

A.    <u>**BACKGROUND**</u>

10.    Since May 2014 to present, reliable information received from a Cooperating Witness (CW), controlled narcotics purchases by an undercover officer (UC), telephone data analysis, audio and video surveillance, and physical surveillance establish probable cause to

believe that XXXXXXXXX XXXXXXX HOOKS has been trafficking controlled substances and firearms in the District of Columbia and the District of Maryland.

**B.      CONTROLLED NARCOTICS BUYS**

**1.      Cooperating Witness Background**

11.      CW-1 has been cooperating with law enforcement since December 2013, at which time CW-1 began working for officers and detectives of the Metropolitan Police Department (MPD) 7th District Vice Units.   Since that time, the CW-1's assistance led to pending investigations which resulted in the recovery of numerous firearms, ammunition and narcotics. CW-1 has made numerous controlled buys for the ATF since CW-1's time working with the ATF; to which the CW-1 has continuously provided reliable and current information.  CW-1 has also played an integral role in this investigation and others by introducing law enforcement personnel acting in an undercover capacity to various narcotics and firearms distributors for the purpose of gathering additional evidence necessary for prosecution.   CW-1 is considered a reliable source and has never provided information that has been proven false.  CW-1 has been paid for the assistance provided in the past, and also has received compensation in this investigation for participation in the controlled narcotics purchases and introduction of a UC, as further discussed below.

**2.      Undercover Officer Information**

12.      The UC has been working as a sworn officer with MPD for over 21 years.  The UC is a Detective assigned to MPD's Narcotics and Special Investigations Division (NSID), but detailed to the ATF.  The UC had been detailed to the Drug Enforcement Administration (DEA) for over 4 years.  The UC has attended several schools administered by the MPD and the DEA, which include drug recognition, court expert witness school, undercover and confidential source

school, interview and interrogation, and two investigator's schools.  The UC has been the affiant in at least 200 search warrants for various violations of the law of the District of Columbia and the United States. These warrants have resulted in the seizure of numerous firearms, confiscation of narcotics and U.S. currency, with numerous arrests.  The UC has participated in the execution of over 800 search warrants and investigations.  This has resulted in at least 400 gun-related arrests and more than 2,500 narcotic arrests.  The UC has participated in over hundreds undercover purchases of illicit drugs and firearms, and has worked in an undercover capacity for over 20 years.

### 3.   Procedures

13.   From July 31, 2014, through September 10, 2014, members of the ATF and MPD conducted four (4) controlled narcotics and firearms purchases from HOOKS utilizing CW-1 and the UC.  On July 31, 2014, and August 7, 2014, HOOKS supplied cocaine to CW-1 and the UC. On August 14, 2014, and September 10, 2014, HOOKS supplied cocaine, a firearm, and ammunition to the UC.  Per standard protocol, and for each of the controlled purchases described below, CW-1 was searched by agents, detectives, or officers and determined to be free of contraband and money prior to, and at the conclusion of each drug buy.  Each controlled purchase or payment was made with pre-recorded MPD or ATF funds.  The controlled buys were arranged with calls being made by CW-1 or the UC to HOOKS.  The ATF obtained one-party consensual audio and/or video recordings of many of the controlled buys from recording devices secreted on CW-1, the UC, or in a vehicle.  Following each of the controlled buys, CW-1 and the UC turned over the narcotics and firearms evidence to MPD or ATF.  A portion of the narcotics evidence from each of the drug buys was field tested positive for controlled substances by MPD

or ATF personnel at the conclusion of drug buy operations.  All the narcotics evidence sold by HOOKS was forwarded to the DEA Mid-Atlantic Laboratory for analysis.

### C.   THE INVESTIGATION

#### 1.   July 31, 2014

14.    On July 31, 2014, On December 13, 2013, law enforcement met with CW-1 and the UC, and provided them each with $1500 of pre-recorded funds for the purchase of cocaine from HOOKS.  CW-1 and the UC then traveled to HOOKS's residence, located at XXXX XXXXXXXXX Drive, XXXX XXXX, XXXXXXXX (the subject premises).  CW-1 had been to HOOKS's residence on prior occasions and had noticed a large number of firearms inside the detached garage to that residence.  These firearms ranged from .9mm pistols to assault-rifle type firearms.  When CW-1 and the UC arrived at HOOKS's residence, CW-1 called HOOKS on HOOKS's cellular telephone.  HOOKS responded via text message that he was approximately 10 minutes away, and later called to indicate that the was around the corner.  HOOKS arrived at his residence in a red Nissan Versa with Florida tags and pulled into his driveway.  CW-1 approached HOOKS's vehicle in the driveway, and HOOKS provided CW-1 with a clear plastic bag containing a white power and rock-like substance in exchange for U.S. currency.  The substance field tested positive for cocaine and weighed approximately 29.1 grams.  The UC then approached HOOK's vehicle in the driveway, and HOOKS provided the UC with a clear plastic bag containing a white power and rock-like substance in exchange for U.S. currency.  The substance field tested positive for cocaine and weighed approximately 27.5 grams.

#### 2.   August 5, 2014

15.    On August 5, 2014, law enforcement met with CW-1 and the UC, and provided the UC with $4300 of pre-recorded funds for the purchase of cocaine and possibly firearms from

HOOKS.  CW-1 and the UC then traveled to the parking lot of a McDonalds, located at 2 I Street, S.E., Washington, D.C.  When CW-1 and the UC arrived at that location, CW-1 called HOOKS on HOOKS's cellular telephone.  HOOKS responded that he was approximately 10 minutes away.  HOOKS arrived driving a grey Nissan Altima with Virginia tags.  CW-1 and the UC got into HOOKS's vehicle, where HOOKS provided them with a clear plastic bag containing a white power and rock-like substance in exchange for U.S. currency.  The substance field tested positive for cocaine and weighed approximately 58.4 grams.  CW-1 and the UC then returned to their vehicle, and they and HOOKS departed the parking lot in their respective vehicles. Following the transaction, HOOKS called the UC and indicated that they believed that both his vehicle and the UC/CW-1 vehicle were being followed.

### 3.     August 14, 2014

16.     On August 14, 2014, law enforcement met with the UC, and provided the UC with $4500 of pre-recorded funds for the purchase of cocaine and possibly firearms from HOOKS.  The UC then communicated with HOOKS on HOOKS's cellular phone concerning meeting.  The UC then traveled to the parking lot of the Hechinger Mall/Safeway, located at 1600 Benning Road, N.E., Washington, D.C.  HOOKS arrived in a red Nissan Versa with Florida tags, which is the same vehicle he used during the July 31, 2014, transaction.  HOOKS was accompanied by a black female and small child.  The UC got into HOOKS's vehicle and the black female and small child exited the vehicle and went into the Safeway.  HOOKS informed the UC he only had "an ounce" and could only get one firearm, which his son had at the time, so the deal would have to be pushed to later that afternoon.  Later that afternoon, HOOKS and the UC returned to the parking lot of the Hechinger Mall/Safeway, located at 1600 Benning Road, N.E., Washington, D.C.  HOOKS arrived in the same red Nissan Versa with Florida tags as

earlier that day and on July 31, 2014.  The UC got into HOOKS's vehicle.  HOOKS provided the UC with several clear plastic bags containing a white powder substance, and two plastic bags containing a loaded Smith & Wesson, Model 38, .38-caliber revolver containing 5 rounds of .38-caliber ammunition in exchange for U.S. currency.  The white power substance field tested positive for cocaine and weighed approximately 54.5 grams with packaging.  Further investigation revealed that HOOKS has a previous felony conviction and does not have a license to deal firearms.

### 4.  September 10, 2014

17.  On September 10, 2014, law enforcement met with the UC, and provided the UC with $3900 of pre-recorded funds for the purchase of cocaine and possibly firearms from HOOKS.  The UC then traveled to the parking lot of the Hechinger Mall/Safeway, located at 1601 Maryland Avenue, N.E., Washington, D.C.  The UC called HOOKS on HOOKS's cellular telephone.  HOOKS responded that he was approximately 10 minutes away.  HOOKS arrived in a gray Nissan Altima with Virginia tags, which is the same vehicle he used during the August 5, 2014, transaction.  The UC got into HOOKS's vehicle.  HOOKS provided the UC with a clear plastic bag containing a white powder and rock-like substance, and a plastic bag containing a loaded Diamondback Firearms, Model DB9, .9-millimeter pistol containing 7 rounds of Remington .9-millimeter ammunition in exchange for U.S. currency.  The white powder and rock-like substance field tested positive for cocaine and weighed approximately 50.7 grams with packaging.

### 5.  October 8, 2014

18.  On October 8, 2014, the UC arranged to meet with HOOKS in the parking lot of the Hechinger Mall/Safeway, located at 1601 Maryland Avenue, N.E., Washington, D.C.

HOOKS arrived in a gray Nissan Altima with Virginia tags, which is the same vehicle he used during the August 5, 2014, and September 10, 2014, transactions.   After the UC got into HOOKS's vehicle, law enforcement units arrested HOOKS.   In plain view in the center console of HOOKS's vehicle, law enforcement observed a clear plastic bag containing a white powder substance sitting on top of a digital scale.   The white powder substance field tested positive for cocaine and weighed approximately 127 grams with packaging.   HOOKS was arrested on an arrest warrant issued following his indictment in <u>United States v. XXXXXXXXX Hooks</u>, 14-CR-204 (RJL).   Law enforcement executed a search warrant at HOOKS's residence in Oxon Hill, Maryland.   During the search, law enforcement recovered an additional quantity of ammunition and drug paraphernalia, including cutting agents commonly used in the preparation of narcotics for distribution.   Law enforcement also recovered the target telephone, which had cocaine residue on it and which was believed to be used by HOOKS's girlfriend and occupant of the residence.   Following his arrest, HOOKS waived his <u>Miranda</u> rights and admitted to having dealings with the UC.   HOOKS further stated that the deal on October 8, 2014, was for 4 1/2 ounces of drugs, which he had obtained from his supplier and "cut" for the deal.   HOOKS stated the remaining amount still was in his vehicle.   HOOKS further stated that his supplier had "fronted" him the drugs, and that he was expected to repay the supplier the same day or the day after the deal.   HOOKS also stated that he would have made approximately $1,000 from the deal. HOOKS also admitted that he had three or four other customers, who buy smaller amounts, such as in half-ounce quantities.   HOOKS added that he does not use the same location for all of his deals, and conducts deals at his home, the homes of his customers, or in hotel parking lots.   Law enforcement also executed a search warrant on the gray Nissan Altima with Virginia tags and recovered a quantity of cocaine and another cellular telephone.

### IV.     COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

19.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the target telephone, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices.  As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

20.     *Probable Cause.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

a.      Individuals who engage in narcotics and firearms trafficking use digital devices to communicate with co-conspirators online, but that they also store on computer hard

drives and other electronic storage media documents and records relating to their illegal activity. Online criminals store these documents and records, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.       Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.       Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of

deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

21.     *Forensic Evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In

particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail

address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to engage in narcotics and firearms trafficking, the individual's device will generally serve both as an instrumentality

for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

22.     *Methods To Be Used To Search Digital Devices.*   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.       Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.       The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during a physical search.  Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain enormous amounts of data.

d.       Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.      Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

g.      Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software

applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

   h.  In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

   1.  Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

   2.  The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## V.      CONCLUSION

23.      Your affiant asserts that the facts contained within this affidavit establish probable cause to believe that the fruit, evidence and instrumentalities of violations of the laws of the United States, specifically: (i) unlawful possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (ii) unlawful distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (iii) unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §  922(g)(1); (iv) using, carrying and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); and (v) engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. §922(a)(1)(A) (collectively, the "subject offenses"), are presently to be found on a ZTE Model Z993 cellular telephone, serial

number 327B41011216, currently located at XXXX X Street, X.X., XXXXXXXXXX, X.X. XXXXX, which was seized by ATF on October 8, 2014, during the execution of a search warrant at the Oxon Hill, MD, residence of XXXXXXXXX XXXXXXX HOOKS (the "target telephone") (the "target telephone").  This evidence and instrumentalities, or documents, records, and related material, specifically include those items listed in Attachment B to this Affidavit in Support of a Search Warrant.  This Attachment B is incorporated herein by reference.  Therefore, in light of the circumstances and the evidence obtained during this investigation, your affiant respectfully submits that probable cause exists for the issuance of a search warrant for the target telephone.

Respectfully submitted,

_____
SAMUEL P. KATZ
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me this _____ of January, 2015.

_____
THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE